**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JAMES W. BRADY and PATRICIA M. BRADY,<br><br>Plaintiffs,<br><br>v.<br><br>GRENDENE USA, INC., a Delaware Corporation, and GRENDENE S.A., a Brazil Corporation,<br><br>Defendants.<br><br>AND RELATED COUNTERCLAIMS | CASE NO. 3:12-cv-0604-GPC-KSC<br><br>**ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT REGARDING LIKELIHOOD OF CONFUSION**<br><br>**[ECF No. 92]**<br><br>**[REDACTED]** |

**I. INTRODUCTION**

Before the Court is Defendants Grendene USA, Inc. and Grendene S.A.'s (collectively, "Grendene") Motion for Summary Judgment Regarding Likelihood of Confusion. (ECF No. 92.) Plaintiffs James W. Brady and Patricia M. Brady (collectively, the "Bradys") filed an opposition. (ECF No. 116.) Grendene responded. (ECF No. 122.) Specifically, Grendene's motion for summary judgment contends that the Bradys' infringement-based claims are unsupported by sufficient proof of the likelihood of confusion between Grendene's use of the IPANEMA mark for sandals and the Bradys' use of the IPANEMA mark for swimwear. Relying on survey evidence and declarations, the Bradys oppose the motion for summary judgment asserting that

1 genuine issues of fact exist as to the likelihood of confusion.

2     The parties have fully briefed the motion. (ECF Nos. 92, 116, 122.) The Court
3 finds the motion suitable for disposition without oral argument pursuant to Civil Local
4 Rule 7.1(d)(1). Upon review of the moving papers, admissible evidence, and applicable
5 law, the Court **DENIES** Grendene's Motion for Summary Judgment Regarding
6 Likelihood of Confusion.

## II. PROCEDURAL BACKGROUND

8     On March 9, 2012, the Bradys filed a complaint against Grendene alleging
9 trademark infringement and unfair competition. (ECF No. 1.) On March 16, 2012, the
10 Bradys filed a first amended complaint ("FAC"). (ECF No. 4.) On October 4, 2012, this
11 case was transferred to the Honorable Gonzalo P. Curiel. (ECF No. 39.) On October
12 3, 2013, Grendene filed two counterclaims: (1) for declaratory judgment of
13 noninfringement, and (2) for declaratory judgment of invalidity. (ECF No. 56.)

14     On July 25, 2014, Grendene filed this motion for summary judgment regarding
15 likelihood of confusion. (ECF No. 92.) On September 5, 2014, the Bradys filed a
16 response in opposition to Grendene's motion. (ECF No. 116.) On September 12, 2014,
17 Grendene replied to the Bradys' opposition. (ECF No. 122.)

## III. FACTUAL BACKGROUND

19     On January 8, 1991, Made in Brazil, Inc. ("MIB"), the Bradys' past and present
20 employer, obtained a registration in the IPANEMA WEAR mark from the United
21 States Patent and Trademark Office ("USPTO"). (ECF No. 117-5); IPANEMA WEAR,
22 Registration No. 1,630,915. On June 22, 1993, the Bradys obtained a registration in the
23 IPANEMA mark for swimwear from the USPTO. (ECF No. 117-6); IPANEMA,
24 Registration No. 1,778,404. On April 15, 1998, the Bradys granted MIB the exclusive
25 right to manufacture swimwear under the Bradys' IPANEMA mark. (ECF No. 91-2,
26 Ex. U.) On May 18, 2004, the Bradys obtained a registration in the THE GIRL FROM
27 IPANEMA mark from the USPTO. (ECF No. 117-7); THE GIRL FROM IPANEMA,
28 Registration No. 2,843,768.

Since 1985, the Bradys have spent over $2 million on advertising and marketing costs for the IPANEMA mark. (ECF No. 116, ¶ 5.) Between 1999 and 2007, the Bradys sold over $2 million worth of swimsuits bearing the IPANEMA and BLACK BEAN marks. (ECF No. 91-2, Ex. F.) In 2006, the Bradys sold much of their inventory to Mercury Beach Maid ("Mercury"). (ECF No. 92-3, Ex. A, at 207:6–12.) Between 2007 and 2009, Mercury marketed swimsuits bearing the Bradys' IPANEMA mark. (ECF No. 117, ¶ 6.) Between 2007 and 2013, approximately 660 swimsuits bearing the Bradys' IPANEMA mark were sold on average each year. (Id.) Approximately ■ of those swimsuits were sold by the Bradys themselves on average each year. (ECF No. 91-2, Ex. G.)

In 2010, Grendene started selling sandals bearing the IPANEMA mark in the United States through ViX Swimwear, Inc ("ViX"). (ECF No. 92-5, ¶ 4.) In 2011, Grendene started selling sandals bearing the IPANEMA mark without any tie to ViX. (Id.) In 2014, "over 3,500 outlets in the U.S., its territories and possessions" sold Grendene's sandals bearing the IPANEMA mark. (Id. ¶ 5.)

The Bradys allege five causes of action against Grendene: (1) trademark infringement under 15 U.S.C. § 1114; (2) false designation of origin under 15 U.S.C. § 1125(a); (3) unfair competition under California Business and Professions Code § 17200; (4) unfair competition under California common law; and (5) cancellation of U.S. Trademark Registration No. 1,908,543 under 15 U.S.C. § 1119. (FAC.) Grendene asserts numerous defenses against the Bradys' causes of action. (See ECF No. 56, at 7–11.)

## IV. LEGAL STANDARD

Federal Rule of Civil Procedure 56 empowers the Court to enter summary judgment on factually unsupported claims or defenses, and thereby "secure the just, speedy and inexpensive determination of every action." Celotex Corp. v. Catrett, 477 U.S. 317, 325, 327 (1986); FED. R. CIV. P. 56. Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together

1  with the affidavits, if any, show that there is no genuine issue as to any material fact
2  and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P.
3  56(c). A fact is material when it affects the outcome of the case. Anderson v. Liberty
4  Lobby, Inc., 477 U.S. 242, 248 (1986).
5      The moving party bears the initial burden of demonstrating the absence of any
6  genuine issues of material fact. Celotex, 477 U.S. at 323. The moving party can satisfy
7  this burden by demonstrating that the nonmoving party failed to make a showing
8  sufficient to establish an element of his or her claim on which that party will bear the
9  burden of proof at trial. Id. at 322–23. If the moving party fails to bear the initial
10 burden, summary judgment must be denied and the Court need not consider the
11 nonmoving party's evidence. Adickes v. S.H. Kress & Co., 398 U.S. 144, 159–60
12 (1970).
13     Once the moving party has satisfied this burden, the nonmoving party cannot rest
14 on the mere allegations or denials of his pleading, but must "go beyond the pleadings
15 and by her own affidavits, or by the 'depositions, answers to interrogatories, and
16 admissions on file' designate 'specific facts showing that there is a genuine issue for
17 trial.'" Celotex, 477 U.S. at 324 (citing FED. R. CIV. P. 56 (1963)). If the non-moving
18 party fails to make a sufficient showing of an element of its case, the moving party is
19 entitled to judgment as a matter of law. Id. at 325. "Where the record taken as a whole
20 could not lead a rational trier of fact to find for the nonmoving party, there is no
21 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S.
22 574, 587 (1986) (citing FED. R. CIV. P. 56 (1963)). In making this determination, the
23 Court must "view [] the evidence in the light most favorable to the nonmoving party."
24 Fontana v. Haskin, 262 F.3d 871, 876 (9th Cir. 2001). The Court does not engage in
25 credibility determinations, weighing of evidence, or drawing of legitimate inferences
26 from the facts; these functions are for the trier of fact. Anderson, 477 U.S. at 255.
27 / /
28 / /

## V. EVIDENTIARY OBJECTIONS

**A. General Evidence**

The Bradys object to the Declaration of Gidget Lee, (ECF No. 92-4). (ECF 120.) The Bradys argue that Ms. Lee's declaration is inconsistent with the response she made to a subpoena over two weeks later. (ECF No. 120, at 1–2; ECF Nos. 118-3, 118-4.) Finding the statements in Ms. Lee's declaration immaterial to the present motion, the Court declines to consider Ms. Lee's declaration.

Grendene objects to the Declaration of James W. Brady, (ECF No. 117). (ECF No. 124.) Grendene argues that the Bradys "impermissibly refused to produce Mr. Brady and three other declarants for depositions" and that Mr. Brady's declaration violates the sham affidavit rule. (Id. at 1–2.) As the parties have discovery motions regarding depositions pending before the magistrate judge in this case, the Court finds that the discovery dispute does not bar the admission of Mr. Brady's declaration for purposes of the present summary judgment motion.

Additionally, the Ninth Circuit has held that the sham affidavit rule applies to "testimony that flatly contradicts earlier testimony in an attempt to 'create' an issue of fact and avoid summary judgment." Kennedy v. Allied Mut. Ins. Co., 952 F.2d 262, 267 (9th Cir. 1991). In this case, Mr. Brady's declaration does not "flatly contradict" his deposition testimony from a separate litigation. Moreover, Mr. Brady has not yet been deposed in the instant case and thus the Court finds that the sham affidavit rule does not bar his declaration. See id. at 266. ("a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact") (citations omitted).

**B. Actual Confusion Evidence**

    **1. Declarations**

The Bradys support their claim of the actual confusion of "dozens of potential

1  customers," trade show attendees, and trade show representatives through several
2  declarations which are based on comments made by trade show attendees at various
3  2014 trade shows. (ECF No. 117, ¶¶ 32, 34; ECF No. 116, at 17–18; ECF Nos. 116-1,
4  116-2, 116-3, 116-4, 116-5, 116-6.) Grendene argues that this evidence is irrelevant
5  because it occurred after the Bradys filed suit. (ECF No. 122, at 8–9.) However, unlike
6  the mark strength factor discussed below, the actual evidence of confusion factor is not
7  limited to pre-suit evidence because present actual confusion is strong evidence that
8  future confusion is likely. See Official Airline Guides, Inc. v. Goss, 6 F.3d 1385, 1393
9  (9th Cir. 1993); see also Worthington Foods, Inc. v. Kellogg Co., 732 F. Supp. 1417,
10 1445 (S.D. Ohio 1990) ("If, at a later time, actual confusion arises, Worthington may
11 have a cogent argument to present.").

12  Grendene contends that all of this evidence is conclusory, hearsay, and self-
13 serving. (ECF No. 122, at 8–9.) The Bradys are offering the statements made by
14 "dozens of trade show attendees" for the truth of the matter asserted, i.e., that they were
15 confused or that they were looking for Grendene's booth when they visited the Bradys'
16 booth. However, Federal Rule of Evidence 803 contains an exception to the hearsay
17 rule for the "then-existing mental, emotional, or physical condition" of the declarant.
18 FED. R. EVID. 803(3). Statements by trade show attendees describing their confusion
19 or intent, i.e., state of mind, qualify as present sense impressions. Accordingly, the
20 Court finds that the portions of the declarations describing actual confusion are
21 admissible for the purposes of opposing the present motion.

22  **2. Survey Evidence**

23  The Bradys assert that a survey commissioned by their expert, Robert L. Klein,
24 shows evidence of actual confusion ("Klein Survey"). (See ECF No. 116, at 11; ECF
25 No. 118-7, at 30.) Grendene argues that the Klein Survey is inadmissible because of the
26 survey's methodology and because the survey is not signed under penalty of perjury.
27 (See ECF No. 122, at 7–9.) In the Ninth Circuit, survey evidence is governed by a two-
28 step process:

> First, is the survey admissible? That is, is there a proper foundation of admissibility, and is it relevant and conducted according to accepted principles? This threshold question may be determined by the judge. Once the survey is admitted, however, follow-on issues of methodology, survey design, reliability, the experience and reputation of the expert, critique of conclusions, and the like go to the weight of the survey rather than its admissibility.

Clicks Billiards, Inc. v. Sixshooters, Inc., 251 F.3d 1252, 1263 (9th Cir. 2001) (citations omitted). One type of survey format is referred to as the "Squirt" format, based on the methodology used in SquirtCo. v. Seven-Up Co.. See 628 F.2d 1086 (8th Cir. 1980); 6 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 32:173.50 (4th ed. 2005). While some courts have excluded "Squirt" format surveys, the Ninth Circuit has held that such surveys are admissible. See Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc., 618 F.3d 1025, 1037–38 (9th Cir. 2010).; cf. National Distillers Prods. Co. v. Refreshment Brands, Inc., 198 F Supp. 2d 474, 484 (S.D.N.Y. 2002). As the Klein Survey followed the "Squirt" format, (see ECF No. 118-7, at 34–38); 6 J. THOMAS MCCARTHY, supra, § 32:173.50, the Klein Survey's methodology does not bar its admission. See Fortune Dynamic, 618 F.3d at 1037–38.

Turning to the Klein Survey's lack of authentication, an unsworn declaration can be used to support or oppose a motion as long as the unsworn declaration specifies that it is signed under penalty of perjury. See FED. R. CIV. P. 56; 28 U.S.C. § 1746. While the docket entry containing the Klein Survey lacks authentication, Robert L. Klein subsequently submitted a declaration authenticating the Klein Survey. (See ECF No. 128.) Accordingly, the Court finds that the Klein Survey is admissible.

## VI. DISCUSSION

The federal statute prohibiting trademark infringement requires a trademark holder to prove that the alleged infringer's use of a mark "is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1)(a), § 1114(1)(b). The question whether an alleged trademark infringer's use of a mark creates a likelihood that the consuming public will "be confused as to who makes what" product is therefore the

"core element" of trademark infringement law. Brookfield Commc'ns, Inc. v. West Coast Entm't Corp., 174 F.3d 1036, 1053 (9th Cir.1999). Likelihood of confusion is also a core element for the Bradys' remaining claims. See Mallard Creek Indus., Inc. v. Morgan, 65 Cal. Rptr. 2d 461, 466–67 (Cal. Ct. App. 1997) (infringement claim under California law); New W. Corp. v. NYM Co. of Cal., 595 F.2d 1194, 1201 (9th Cir. 1979) (federal false designation of origin claim, 15 U.S.C. § 1125(a)(1)(A), and unfair competition claim under California law).

**A. Type of Confusion**

There are two types of trademark infringement causes of action: forward confusion and reverse confusion. Surfvivor Media, Inc. v. Survivor Prods., 406 F.3d 625, 630 (9th Cir. 2005) (citation omitted). "Forward confusion occurs when consumers believe that goods bearing the junior mark came from, or were sponsored by, the senior mark holder." Id. (citation omitted). "[R]everse confusion occurs when consumers dealing with the senior mark holder believe that they are doing business with the junior one." Id. (citation omitted).

While the Bradys argue that this Court can apply analysis for both forward and reverse confusion, (see ECF No. 116, at 14, 25), the Bradys' FAC alleges that Grendene intended "to deceive the public into believing that [Grendene's] products are associated with, sponsored by or approved by [the Bradys], when they are not" and that Grendene intended "to trade upon [the Bradys'] reputation and goodwill by causing confusion and mistake among customers and the public." (FAC ¶¶ 29, 36.) Accordingly, the Court finds that the FAC states a claim for forward confusion, not reverse confusion.

**B. Factor Analysis**

In determining whether there is a likelihood of confusion, the Court analyzes the eight Sleekcraft factors: (1) strength of the mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7)

defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines." AMF Inc. v. Sleekcraft Boats, 599 F.2d 341, 348–49 (9th Cir. 1979), abrogated on other grounds by Mattel, Inc. v. Walking Mountain Prods., 353 F.3d 792 (9th Cir. 2003). However, the Sleekcraft factors should be considered "guideposts" and are "neither exhaustive nor exclusive." Fortune Dynamic, 618 F.3d at 1031 (quoting E. & J. Gallo Winery v. Gallo Cattle Co., 967 F.2d 1280, 1290 (9th Cir.1992). The importance of each factor depends on the facts of a given case. Brookfield, 174 F.3d at 1054. Additionally, the Ninth Circuit has cautioned that "summary judgment on 'likelihood of confusion' grounds is generally disfavored" because "likelihood of confusion is often a fact-intensive inquiry." Rearden LLC v. Rearden Commerce, Inc., 683 F.3d 1190, 1210 (9th Cir. 2010) (citations omitted).

**1. Strength of the Mark**

The strength of a trademark is a two-pronged inquiry. First, the Court determines the senior mark's conceptual strength by classifying it "along a spectrum of generally increasing inherent distinctiveness:" (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, (5) fanciful. Brookfield, 174 F.3d at 1058 (citing Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 768 (1992)). Second, in a forward confusion case, the Court assesses the commercial strength of senior mark, measured at the time of litigation or at the time of application for registration. Classic Foods Intern. Corp. v. Kettle Foods, Inc., No. 04-cv-0725-CJC, 2006 WL 5187497, at *11 (C.D. Cal. Mar. 2, 2006) (quoting 2 J. THOMAS MCCARTHY, supra, § 11:83); cf. Boldface Licensing + Branding v. By Lee Tillett, Inc., 940 F. Supp. 2d 1178, 1190 (C.D. Cal. 2013). Even if a mark falls on the weak end of the spectrum, commercial strength can bolster the mark's overall strength. M2 Software, Inc., a Del. Corp., v. Madacy Entm't, a Corp., 421 F.3d 1073, 1081 (9th Cir. 2005). Additionally, if a mark meets the requirements set forth in 15 U.S.C. § 1065, it attains incontestable status which provides certain rights set forth in 15 U.S.C. § 1115(b). Entrepreneur Media, Inc. v. Smith, 279 F.3d 1135, 1139 n.1 (9th Cir. 2002).

A descriptive mark directly describes the qualities or features of a product. Brookfield, 174 F.3d at 1058 n.19. A geographic mark is considered a descriptive mark "when it connotes the location or origin of goods sold under the mark." Moose Creek, Inc. v. Abercrombie & Fitch Co., 331 F. Supp. 2d 1214, 1222 (C.D. Cal. 2004) (citation omitted). Descriptive marks are "not inherently distinctive," but "can become protectable" if the mark acquires secondary meaning. Zobmondo Entm't, LLC v. Falls Media, LLC, 602 F.3d 1108, 1113 (9th Cir. 2010) (quoting Two Pesos, 505 U.S. at 769). Secondary meaning is acquired when the public associates the mark with a specific source. Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery, 150 F.3d 1042, 1047 (9th Cir. 1998) (citation omitted). If a mark attains incontestable status, that is considered conclusive proof that the mark has secondary meaning. Entrepreneur Media, 279 F.3d at 1142 n.3.

A suggestive mark suggests the qualities or features of a product, such that the consumer must make an imaginative leap to understand the mark's relation to the product. Kendall-Jackson Winery, 150 F.3d at 1047 n.8. "[S]uggestive marks are presumptively weak," though that presumption can be overcome if the mark achieves "widespread recognition." Brookfield, 174 F.3d at 1058.

An arbitrary mark "uses common words in a fictitious and arbitrary manner to create a distinctive mark which identifies the source of the product" where "consumers associate the trademark with the product." Dreamwerks Prod. Grp., Inc. v. SKG Studio, 142 F.3d 1127, 1130 n.7 (9th Cir. 1998). A geographic mark is considered an arbitrary mark when there is no likelihood that consumers would understand that "the goods or their constituent materials were produced or processed" in the geographic region connoted by the mark, and no likelihood that consumers would understand that the products are "of the same distinctive kind or quality as those produced, processed or used" in the geographic region connoted by the mark. Nat'l Lead Co. v. Wolfe, 223 F.2d 195 (9th Cir. 1955), cert. denied, 350 U.S. 883 (1955).

### i. Conceptual Strength

Grendene argues that the Bradys' IPANEMA mark should be considered suggestive because it suggests the "internationally famous . . . beach" located in Brazil's Ipanema neighborhood when used in conjunction with beach-related products. (ECF No. 91, at 15.) Citing Moose Creek, the Bradys argue that their IPANEMA mark should be considered arbitrary even though it is a location. (See ECF No. 116, at 20–21.). The Moose Creek court specifically noted that the mark in that case "d[id] not describe any ingredient, characteristic or quality" of the plaintiffs' products. 331 F. Supp. 2d at 1222.

Though the Bradys' IPANEMA mark stems from the geographic region known as "Ipanema," none of the products bearing the IPANEMA mark are currently designed, produced, or sold in Ipanema or Ipanema's home country, Brazil. However, unlike the Dutch Boy mark which was considered arbitrary when applied to American paint, Nat'l Lead, 223 F.2d 195, the Bradys' IPANEMA mark is not arbitrary when applied to beachwear. The tag attached to one of the products bearing the IPANEMA mark states that "IPANEMA WAS BORN ON THE BEACHES OF RIO DE JANEIRO, BRAZIL" and that the product has "BRAZILIAN FLAIR." (ECF No. 117-19, at 88.) In addition to English, the tag also uses several Portuguese words, the language of Ipanema and Brazil. (See id. ("Paz e Amor").) The Bradys' use of the IPANEMA mark is not arbitrary, rather it is suggestive of the style of beachwear worn on Ipanema's beach. See In re the Fred Gretsch Company, Inc., 159 U.S.P.Q. 60, at *1 (T.T.A.B. 1968) ("'NASHVILLE' as applied to guitars is only suggestive of a country style of music which is normally played on guitars"). Accordingly, the Court finds that the Bradys' IPANEMA mark is suggestive and provides limited support for likelihood of confusion.

### ii. Commercial Strength

The Court notes that both Grendene and the Bradys cite evidence regarding commercial strength that originates after this lawsuit's filing. (See ECF No. 91, at 16;

ECF No. 116, at 21.) As the correct inquiry is the strength of the Bradys' mark at the time of the litigation, evidence originating after this lawsuit's filing date does not bear on the IPANEMA mark's strength for the purposes of this summary judgment motion. See Classic Foods, 2006 WL 5187497, at *11 (citation omitted). Additionally, the Bradys argue that because the IPANEMA mark has attained incontestable status it is therefore strong. (ECF No. 116, at 13–14.) However, incontestable status "does not require a finding that the mark is strong." Entrepreneur Media, 279 F.3d at 1142 n.3. Thus the Court analyzes the IPANEMA mark's commercial strength as of this lawsuit's filing in 2012.

Grendene argues that the Bradys' IPANEMA mark is commercially weak based on MIB's sales and advertising expenditures for the years 2006 through 2012. (See ECF No. 91, at 15–17.) The Bradys argue that their IPANEMA mark is commercially strong based on MIB's sales and advertising expenditures for all the years prior to 2012, including the years prior to 2006. (See ECF No. 116, at 21.) In addition, the parties disagree as to whether third party sales of products bearing the Bradys' IPANEMA mark affect the IPANEMA mark's commercial strength. As many trademarked products are sold through third party retailers rather than directly by the mark holder, the Court sees no reason why third party retail sales should not be considered in assessing the IPANEMA mark's commercial strength.

While sales and advertising expenditures do increase a mark's commercial strength, the older such expenditures are the less impact they have on a mark's commercial strength. Though the Bradys have spent millions selling and marketing the IPANEMA mark, only a few thousand swimsuits bearing the IPANEMA mark were sold in the half decade prior to this lawsuit. Accordingly, the Court finds that the Bradys' IPANEMA mark is weak and that this factor slightly favors Grendene.

**2. Proximity of the Goods**

Proximity of the goods determines "whether the goods are related or complementary." M2 Software, 421 F.3d at 1081–82 (citation omitted). The Court

measures proximity by looking at whether the goods are: "(1) complementary; (2) sold to the same class of purchasers; and (3) similar in use and function." Network Automation, Inc. v. Advanced Sys. Concepts, Inc., 638 F.3d 1137, 1150 (9th Cir. 2011) (citing Sleekcraft, 599 F.2d at 350). Complementary goods, i.e., goods or services that are used together, may be considered related in a confusion analysis. See, e.g., Fortune Dynamic, 618 F.3d at 1035 ("female footwear and a female tank top . . . are targeted to the same consumers: young women," and the "products are complementary"). Here, women's beach wear and women's beach sandals are targeted towards the same consumers, i.e., women, and are complementary.

Where products are unlabeled and consumers are unsophisticated, proximity is a more relevant factor. Network Automation, 638 F.3d at 1150. Conversely, where products are labeled and consumers are sophisticated, proximity is a less relevant factor. Id. Grendene has not proffered any evidence regarding the sophistication of potential purchasers. Instead, Grendene argues that purchaser care is "irrelevant" because the Bradys' products "ha[ve] been absent from the marketplace." (ECF No. 91, at 22.) In contrast, the Bradys argue that they have been in the market and that, in spite of the fact that their swimwear retails for "$100–$150," likely consumers are not sophisticated. (ECF No. 116, at 24–25.) Accordingly, the Court finds that this factor slightly favors the Bradys.

### 3. Similarity of the Marks

The greater the similarity between two marks, "the greater the likelihood of confusion." Brookfield, 174 F.3d at 1054. The Court assesses similarity "on three levels: sight, sound, and meaning." Sleekcraft, 599 F.2d at 351 (citations omitted). Each level is considered "as [it] is encountered in the marketplace." Id.

Both the Bradys and Grendene use the word "Ipanema" in their marks. Both marks sound the same and both having the same meaning, referring to the Ipanema neighborhood in Brazil. This leaves sight as the only possible differentiator between the two marks.

The Bradys' mark:

   

(ECF No. 118-2, at 2.)

Grendene's mark:

 

(ECF No. 92-3, at 108–09; ECF No. 91, at 4.)

The Bradys have used various versions of the IPANEMA mark. While the Bradys' mark is generally written in all capital letters in a serif font, it has appeared with any or none of the following: a logo, two cartoon parrots, the name "Patricia Martins," and the name "Patrixia Martins." Grendene has used two different versions of the IPANEMA mark. The first has the letter "i" in lower case and the letters "PANEMA" in upper case, all in a sans-serif font. The second has the letter "I" in upper case and the letters "panema" in lower case, all in a cursive font. Both of

1  Grendene's marks appear with a colored shoe sole outline behind the letters. In spite
2  of the minor typographical differences, the appearance of the marks used by the Bradys
3  and the marks used by Grendene are visually similar based on strong prominence of the
4  word "Ipanema" in both marks. Accordingly, the Court finds that the marks are similar
5  and that this factor weighs in favor of the Bradys.

### 4. Evidence of Actual Confusion

"Evidence of actual confusion is strong evidence that future confusion is likely." Official Airline Guides, 6 F.3d at 1393 (citation omitted). However, "the absence of such evidence is not dispositive." Id. Actual confusion can also be established by survey evidence. Fortune Dynamic, 618 F.3d at 1035. As noted above, the Bradys have provided admissible evidence of the actual confusion of "dozens of trade show attendees" and submitted an admissible survey showing actual confusion. While Grendene criticizes the Klein Survey's methodology, such criticisms are for the trier of fact. Accordingly, the Court finds that this factor weighs in favor of the Bradys.

### 5. Marketing Channels

"Convergent marketing channels increase the likelihood of confusion." Nutri/System, Inc. v. Con-Stan Indus., Inc., 809 F.2d 601, 606 (9th Cir.1987). While Grendene argues that the Bradys have used no marketing channels, (ECF No. 91, at 20), the Bradys point out that both they and Grendene have exhibited at the same trade shows. (ECF No. 117, ¶¶ 24–25.) Accordingly, the Court finds that this factor weighs in favor of the Bradys.

### 6. Type of Goods and the Degree of Care Likely to Be Exercised by the Purchaser

The standard for assessing the type of goods and level of consumer care is the hypothetical "typical buyer exercising ordinary caution." Sleekcraft, 599 F.2d at 353. Where the product is expensive, consumers are expected to exercise a higher level of care; where the product is cheap, consumers are expected to exercise a lower level of care. Network Automation, 638 F.3d at 1152. In both forward and reverse confusion

1  cases, the Court considers the degree of care of the senior user's customers.
2  Abercrombie & Fitch, 486 F.3d at 634 n.2. As noted above in the proximity factor
3  section, Grendene has not offered any evidence regarding consumer sophistication
4  whereas the Bradys argue that purchasers of $100–$150 swimwear exercise a low
5  degree of care. Accordingly, the Court finds that this factor weighs in favor of the
6  Bradys.

7  **7. Defendant's Intent in Selecting the Mark**

8  In analyzing intent, the Court assesses whether the alleged infringer "adopted
9  [the] mark with knowledge, actual or constructive, that it was another's trademark."
10 Brookfield, 174 F.3d at 1059 (citations omitted). If the alleged infringer knowingly
11 adopted the plaintiff's mark, the Court presumes an "intent to deceive the public." Id.

12 The parties do not dispute that Grendene was aware of the Bradys' IPANEMA
13 mark prior to Grendene's sale of IPANEMA products in the United States. However,
14 the parties do dispute whether Grenden knew what products the Bradys' IPANEMA
15 mark covered. The Bradys allege that Grendene knew that the Bradys' mark included
16 sandals. Grendene alleges that the Bradys told Grendene that the Bradys' mark did not
17 include sandals. As the parties dispute the evidence surrounding Grendene's
18 knowledge and intent, the Court finds that this factor slightly favors the Bradys.

19 **8. Likelihood of Expansion of the Product Lines**

20 Likelihood of expansion considers whether there is a "'strong possibility' that
21 either party may expand his business to compete with the other." Sleekcraft, 599 F.2d
22 at 354 (citation omitted). The issue is "whether parties are likely to compete with a
23 similar product in the same market." Official Airline Guides, 6 F.3d at 1394 (citation
24 omitted).

25 The Bradys argue that this factor favors them because "Grendene consistently
26 markets its sandals alongside swimwear." (ECF No. 116, at 24.) However, this factor
27 focuses not just on the market but also the similarity of the products. While Grendene
28 and the Bradys may compete in the same market, there is no indication of a "strong

possibility" that the Bradys will sell sandals or that Grendene will sell swimwear. Accordingly, this Court finds that this factor weighs in favor of Grendene.

**C. Likelihood of Confusion**

In analyzing the <u>Sleekcraft</u> and other relevant factors, the Court finds that, as a whole, they weigh in favor of the Bradys. Only two of the factors—strength of the mark and likelihood of expansion—favor Grendene, and the former only slightly. Additionally, the evidence surrounding several of the factors is disputed by the parties. Accordingly, the Court DENIES Grendene's motion for summary judgment regarding likelihood of confusion.

## VII. CONCLUSION AND ORDER

For the reasons stated above, **IT IS HEREBY ORDERED** that Grendene's Motion for Summary Judgment Regarding Likelihood of Confusion, (ECF No. 92), is **DENIED**.

DATED: November 5, 2014

HON. GONZALO P. CURIEL
United States District Judge