1
2
3
4
5
6
7
8                    **UNITED STATES DISTRICT COURT**

9                    **SOUTHERN DISTRICT OF CALIFORNIA**

10   JAMES W. BRADY and PATRICIA        CASE NO. 3:12-cv-0604-GPC-KSC
     M. BRADY,
11                                       **ORDER GRANTING GRENDENE'S
                              Plaintiffs, PARTIAL RENEWED MOTION**
12      v.                               **FOR SUMMARY JUDGMENT, OR,
                                         IN THE ALTERNATIVE, PARTIAL**
13                                       **SUMMARY JUDGMENT**

14   GRENDENE USA, INC., a Delaware
     Corporation, and GRENDENE S.A., a   **[ECF No. 216]**
15   Brazil Corporation,

16                             Defendants.

17    AND RELATED COUNTERCLAIMS

18
19                          **I. INTRODUCTION**

20          This is a trademark infringement action. Defendants Grendene USA, Inc. and

21   Grendene S.A. (collectively, "Grendene") previously moved for summary judgment

22   based on a settlement agreement and an affirmative defense of laches. (ECF No. 72.)

23   Because there were disputes of material fact regarding the validity of the trademark

24   assignments among Grendene and its predecessors, the Court denied that motion (the

25   "November 12 Order"). (ECF No. 158.) Grendene now moves the Court to reconsider

26   its initial ruling. (ECF No. 216.) Plaintiffs James W. Brady and Patricia M. Brady

27   (collectively, the "Bradys") oppose, arguing that Grendene's motion is both untimely

28   and substantively flawed. (ECF No. 266.) A hearing on Grendene's motion was held

on May 22, 2015. (ECF No. 269.) Upon review of the moving papers,[1] admissible evidence, oral argument, and applicable law, the Court GRANTS Grendene's motion for summary judgment because the Court finds that Grendene has been validly assigned the '543 mark and therefore the Settlement Agreement bars the Bradys' causes of action against Grendene.

## II. BACKGROUND

The factual and procedural background of this case is detailed in the Court's November 12 Order. (ECF No. 158, at 2–7.) In sum, the Bradys and the Ipanema Shoe Corporation ("ISC") both obtained registration in the mark "IPANEMA"; the Bradys' mark was for swimwear, IPANEMA, Registration No. 1,778,404 (the "'404 mark"), and ISC's mark was for footwear, IPANEMA, Registration No. 1,908,543 (the "'543 mark"). (*Id.*) After a dispute arose between them regarding the IPANEMA mark, but the Bradys, through their company Made in Brazil, Inc. ("MIB"), and ISC entered into a settlement agreement (the "Settlement Agreement"). (*Id.*) The '543 mark was then purportedly assigned by ISC to Utopia Marketing Inc. ("Utopia"), then by Utopia to Consolidated Shoe Corporation ("CSC"), and finally by CSC to Grendene. (*Id.*) In the November 12 Order, the Court found that the evidence submitted at the time indicated a dispute of material fact regarding the validity of these assignments. (*Id.* at 12–13.) Grendene, citing new evidence, now argues that: (1) these assignments were valid, (2) which makes Grendene a successor to ISC under the Settlement Agreement, and (3) the Settlement Agreement bars the Bradys' claims against Grendene. (ECF No. 216.) Based on this argument, Grendene asserts that it is entitled to summary judgment on all five of the Bradys' causes of action. (*Id.*) The Bradys counter that: (1) at least some of these assignments were invalid, (2) which means that Grendene is not a successor to ISC under the Settlement Agreement, and (3) even if Grendene were ISC's

---

[1] The Bradys moved for leave to file a sur-reply. (ECF No. 260.) Good cause appearing, the Bradys' ex parte motion is GRANTED and the Court considers the arguments contained in their sur-reply, (ECF No. 260-1). Additionally, the parties have submitted post-hearing briefs, (ECF Nos. 270, 271), which the Court also considers.

successor, the Settlement Agreement bars the sale of Grendene's sandals, which forms the basis of the Bradys' causes of action. (ECF No. 266.)

### III. LEGAL STANDARD

**A. Summary Judgment**

Federal Rule of Civil Procedure 56 empowers the Court to enter summary judgment on factually unsupported claims or defenses, and thereby "secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 327 (1986); FED. R. CIV. P. 56. Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). A fact is material when it affects the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of demonstrating the absence of any genuine issues of material fact. *Celotex*, 477 U.S. at 323. The moving party can satisfy this burden by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element of his or her claim on which that party will bear the burden of proof at trial. *Id.* at 322–23. If the moving party fails to bear the initial burden, summary judgment must be denied and the Court need not consider the nonmoving party's evidence. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

Once the moving party has satisfied this burden, the nonmoving party cannot rest on the mere allegations or denials of his pleading, but must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (citing FED. R. CIV. P. 56 (1963)). If the non-moving party fails to make a sufficient showing of an element of its case, the moving party is entitled to judgment as a matter of law. *Id.* at 325. "Where the record taken as a whole

could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing FED. R. CIV. P. 56 (1963)). In making this determination, the Court must "view [] the evidence in the light most favorable to the nonmoving party." *Fontana v. Haskin*, 262 F.3d 871, 876 (9th Cir. 2001). The Court does not engage in credibility determinations, weighing of evidence, or drawing of legitimate inferences from the facts; these functions are for the trier of fact. *Anderson*, 477 U.S. at 255.

**B. Reconsideration**

Under Federal Rules of Civil Procedure 59 and 60, federal district courts may reconsider final orders to correct "manifest errors of law." *Turner v. Burlington N. Sante Fe R.R.*, 338 F.3d 1058, 1063 (9th Cir. 2003). Generally, parties must show either: (1) an intervening change in the law; (2) additional evidence that was not previously available; or (3) that the prior decision was based on clear error or would work manifest injustice. *Marlyn Natraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 880 (9th Cir. 2009); *Sch. Dist. No. 1J v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993); *Pyramid Lake Paiute Tribe of Indians v. Hodel*, 882 F.2d 364, 369 n.5 (9th Cir. 1989).

Reconsideration is an "extraordinary remedy, to be used sparingly in the interests of finality and conservation of judicial resources." *Kona Enters., Inc. v. Estate of Bishop*, 229 F.3d 877, 890 (9th Cir. 2000). "'A motion for reconsideration is not an opportunity to renew arguments considered and rejected by the court, nor is it an opportunity for a party to re-argue a motion because it is dissatisfied with the original outcome.'" *Fed. Trade Comm'n v. Neovi, Inc.*, No. 06-cv-1952-JLS-JMA, 2009 WL 56130, at *2 (S.D. Cal. Jan. 7, 2009) (quoting *Devinsky v. Kingsford*, No. 05-cv-2064-PAC, 2008 WL 2704338, at *2 (S.D.N.Y. July 10, 2008)).

In addition to these substantive standards, Civil Local Rule 7.1.i.1 requires a party moving for reconsideration to submit an affidavit or certified statement of an attorney:

setting forth the material facts and circumstances surrounding each prior
application, including inter alia: (1) when and to what judge the
application was made, (2) what ruling or decision or order was made
thereon, and (3) what new or different facts and circumstances are claimed
to exist which did not exist, or were not shown, upon such prior
application.

CivLR 7.1.i.1. Civil Local Rule 7.1.i.2 provides that "any motion or application for
reconsideration must be filed within twenty-eight (28) days after the entry of the ruling,
order or judgment sought to be reconsidered." CivLR 7.1.i.2.

## IV. DISCUSSION

Grendene's argument consists of three parts: (1) the Settlement Agreement bars
the Bradys from suing ISC's successors over the use of the IPANEMA mark on any
footwear, (2) the successor to ISC is the entity that has been validly assigned the '543
mark, and (3) Grendene has been validly assigned the '543 mark. (ECF No. 216-1.) The
Court addresses these arguments in turn after it addresses the Bradys' objections
regarding timeliness and reconsideration. (*See* ECF No. 266.)

## A. Timeliness

The Bradys argue that Grendene's motion is untimely for failure to comply with
Local Rule 7.1.i.2 . (ECF No. 266, at 7–8.) This Court denied Grendene's initial
summary judgment motion on November 12, 2014. (ECF No. 158.) Grendene filed its
motion for reconsideration on April 7, 2015, far outside of Local Rule 7.1.i.2's 28 day
window. (ECF No. 216.) Though Grendene styles its present motion as a motion for
reconsideration in the alternative, the Court finds that, because the present motion for
summary judgment seeks the same relief that this Court initially denied, (*compare* ECF
No. 216 *with* ECF No. 158), Local Rule 7.1(i)(2) applies to Grendene's motion.
However, Federal Rule of Civil Procedure 6(b)(1) provides that an extension of time
may be granted for "good cause." FED. R. CIV. P. 6(b)(1). The Court finds that
Grendene has satisfied Rule 6(b)(1)'s good cause requirement because the factual
record has expanded since the Court's initial ruling, including the deposition of several
witnesses. (*See* ECF No. 254, at 4); *see also Hoffman v. Tonnemacher*, 593 F.3d 908,

911–12 (9th Cir. 2010) (quoting *Whitford v. Boglino*, 63 F.3d 527, 530 (7th Cir. 1995) (per curiam)) ("A renewed or successive summary judgment motion is appropriate especially if . . . [there is] the availability of new evidence or an expanded factual record . . . .") (alterations in original). Accordingly, the Court finds good cause to excuse Grendene's failure to comply with Local Rule 7.1.i.2's 28 day requirement.

**B. Reconsideration**

The Bradys next argue that Grendene's motion is improper because the evidence presented by Grendene is not "newly discovered." (ECF No. 266, at 7–8.) However, reconsideration is "addressed to the sound discretion of the trial court," *Thompson v. Housing Authority of City of L.A.*, 782 F.2d 829, 832 (9th Cir. 1986), and the Court finds it appropriate to consider Grendene's motion based on the fact that the factual record has expanded. *See Whitford*, 63 F.3d at 530.

**C. The Settlement Agreement**

The parties have conflicting interpretations of the Settlement Agreement. The Bradys contend that it bars Grendene's current sale of sandals bearing the IPANEMA mark. (ECF No. 266, at 16–18.) Grendene contends that the Settlement Agreement bars the Bradys' trademark causes of action against Grendene. (ECF No. 216-1, at 18.)

**1. The Bradys' Interpretation**

The Bradys argue that two phrases constitute "terms" of the Settlement Agreement: (1) a whereas clause, and (2) a statement in the Letter of Consent that the Settlement Agreement obligated MIB to execute. (ECF No. 266, at 17.) The Bradys argue that these statements "reflect[] the parties' intent that ISC would be permitted to register the mark for footwear, so long as its use remained in channels of trade distinct from the Bradys and ISC did not enter the swimwear and activewear market." (*Id.*) The Court disagrees.

First, the Bradys to a point a whereas clause that states that "the goods offered by ISC and MIB [the Bradys] travel in distinct channels of trade such that consumers are not likely to be confused by each party's use of its respective trademark." (ECF No.

94-5.) However, this statement is not a "term" of the Settlement Agreement. Under New York law, which governs the Settlement Agreement, (ECF No. 94-5, Ex. 5, at 3), statements in "whereas" clauses do not "create any right beyond those arising from the operative terms of the document." *Grand Manor Health Related Facility, Inc. v. Hamilton Equities Inc.*, 885 N.Y.S.2d 255, 256 (N.Y. App. Div. 2009) (citation omitted); *see also  Ross v. Ross*, 253 N.Y.S. 871, 882 (N.Y. App. Div. 1931) ("The recitals in a contract form no part thereof, and at most indicate but the purposes and motives of the parties."). While "'whereas' clauses may be useful in interpreting an ambiguous operative clause," the Bradys do not point to any ambiguous operative clause within the Settlement Agreement. *Grand Manor*, 885 N.Y.S.2d at 256.

Second, the Bradys to point to the Letter of Consent that the Settlement Agreement obligated them to file with the USPTO which states that ISC "has no plans to enter the swimwear and activewear marke." (ECF No. 94-6.) The Settlement Agreement only obligated MIB to "execute[]" the Letter of Consent and contains no indication that the words in the Letter of Consent bound ISC in any way. (ECF No. 94-5, Ex. 4, at 2.) While the Bradys argue that the Letter of Consent was "incorporated," (ECF No. 266, at 17), there is no indication anywhere in the Settlement Agreement that the language in the Letter of Consent would create rights between the parties or act as operative terms of the document. Accordingly, the Court finds that neither of the statements cited by the Bradys are operative clauses and thus rejects the Bradys' interpretation of the Settlement Agreement.

## 2. Grendene's Interpretation

Grendene argues that the Bradys' trademark causes of action against Grendene are barred by the Settlement Agreement. (ECF No. 216-1, at 18.) There is no dispute that the sandals sold by Grendene constitute "footwear." (ECF No. 93, at 23

1  ("Grendene's beach sandals are [] footwear . . . .").)[2] The Settlement Agreement

2  obligates the Bradys to "make no objection, formally or informally, to the use by ISC,

3  its affiliates, predecessors and successors of the term IPANEMA as a trademark in the

4  selling of footwear as long as such use is in accordance with the terms of this

5  Agreement." (ECF No. 94-5, Ex. 4, at 2.) Having rejected the Bradys' interpretation of

6  the Settlement Agreement, the Court finds that the agreement does bar the Bradys from

7  suing ISC's successors over their use of the IPANEMA mark on any footwear. The

8  Court now turns to the issue of whether Grendene is a successor to ISC under the

9  Settlement Agreement.

10  **D. Assignment Validity**

11       Grendene argues that it is the successor to the Settlement Agreement because it

12  has been validly assigned the '543 mark. (ECF No. 216-1.) The Bradys argue three

13  reasons why Grendene does not have a valid assignment of the '543 mark: (1) the

14  assignment between ISC and Utopia was invalid, (2) Utopia and Grendene abandoned

15  the IPANEMA mark, and (3) the assignment between CSC and Grendene was invalid.

16  (ECF No. 266, at 4, 8–15.)

17       **1. Utopia's Sales**

18       As an initial matter, there is a disagreement regarding whether the facts show

19  that Utopia sold shoes bearing the IPANEMA mark, and, if so, to what extent those

20  shoes differed from those sold by ISC. The Bradys rely primarily on three things: (1)

21  Utopia's statements to the Securities and Exchange Commission (the "SEC"), (2)

22  statements by a former Utopia employee, and (3) an initial answer given by Utopia's

23  former CEO during his deposition. (ECF No. 266, at 8–11.)

24       First, Utopia's statements to the SEC do not, as the Bradys' contend, show that

25

26

27       [2] The parties do, however, dispute whether Grendene's sandals can also be

28  characterized as either "swimwear" or "activewear." (*See* ECF No. 93, at 23.) Because the Court has rejected the Bradys' interpretation of the Settlement Agreement, this dispute is irrelevant for purposes of the present motion.

Utopia abandoned the goodwill[3] of the IPANEMA mark. (*See* ECF No. 266, at 10; ECF No. 260-1, at 1.) Though Utopia stated to the SEC that it "does not intend to continue" and "is in fact not continuing the business formerly operated by" ISC,[4] other language in Utopia's Form 8-K/A letter explicitly makes clear that Utopia did intend to sell footwear bearing the IPANEMA mark, just that the footwear would be different from that sold by ISC. (ECF No. 95-14, Ex. 13, at 599 ("[Utopia] intends to utilize the Ipanema brand for a different line of shoe products.").) As the Court has previously noted, assignment validity turns not on *whether* differences exist between products sold under the mark, but on *what* those differences are. (*See* ECF No. 158, at 11); *see also PepsiCo, Inc. v. Grapette Co.*, 416 F.2d 285, 288 (8th Cir. 1969). Though Utopia may have described its decision to alter the type of footwear sold under the IPANEMA mark as "not continuing the business formerly operated by" ISC, this statement's actual meaning is clarified by the rest of Utopia's Form 8-K/A letter and the evidence does show that Utopia actually sold footwear bearing the IPANEMA mark. (*See* ECF No. 216-7, Ex. C, 22:8–23:5)

Second, the Bradys' arguments regarding the statements of Dennis Mulcahy, a former Utopia employee, fail for the same reason. While Mulcahy stated that there were "significant changes" when the Utopia started selling IPANEMA footwear, (ECF No. 229-2, Ex. 1, at 20:4–21:11), what matters is what those changes were. Moreover, Mulcahy did in fact describe the shoes sold by Utopia, (*see* ECF No. 216-7, Ex. C, 22:8–23:5), which allows the Court to compare them to the footwear sold by ISC and

---

[3] As the Court discussed in the November 12 order, a mark must be assigned with its goodwill to constitute a valid assignment. (ECF No. 158, at 11.) "To determine whether the goodwill was assigned with the mark, the Court makes a case-by-case determination whether the products or services offered by the assignee under the mark are substantially similar to those that were offered by the assignor under the mark." (*Id.* (citations omitted).)

[4] These statements are somewhat inconsistent because the initial use of the phrase "does not intend to continue" arguably shows a prospective intent to abandon, whereas the later use of phrase "is . . . not continuing" arguably shows an intent not to resume. *See Electro Source, LLC v. Brandess-Kalt-Aetna Group, Inc.*, 458 F.3d 931, 937 (9th Cir. 2006). However, this inconsistency is immaterial due to the rest of Utopia's statements to the SEC, as discussed in this section.

CSC to determine whether there was a valid assignment.

Third, the statement by Utopia's former CEO is not evidence that Utopia did not sell footwear bearing the IPANEMA mark. The full response of Utopia's former CEO was "I don't remember [whether Utopia sold footwear under the IPANEMA mark], but I think [Utopia] did." (ECF No. 229-4, Ex. 3, at 17:4–9.) Moreover, the statements of Mulcahy, as well as Utopia's other filings with the SEC, make clear that Utopia did sell shoes bearing the IPANEMA mark. As the evidence shows that Utopia sold shoes bearing the IPANEMA mark, the Court now turns to whether Utopia abandoned the mark and whether Grendene obtained a valid assignment.

## 2. Abandonment

The Bradys primary argument is that both Utopia and Grendene have abandoned the IPANEMA mark. (ECF No. 266, at 4, 11.) Abandonment "requires an intent not to resume trademark use, as opposed to a prospective intent to abandon the mark in the future." *Electro Source*, 458 F.3d at 937; 15 U.S.C. § 1127. Additionally, three consecutive years of nonuse constitutes prima facie evidence of abandonment. 15 U.S.C. § 1127. If the party asserting abandonment establishes a prima facie case of abandonment, "a rebuttable presumption of abandonment is created." *Abdul-Jabbar v. Gen. Motors Corp.*, 85 F.3d 407, 411 (9th Cir. 1996). This presumption places the burden of production on the party opposing the allegations of abandonment. *Emergency One, Inc. v. Am. FireEagle Ltd.*, 228 F.3d 531, 535–37 (4th Cir. 2000). The burden is on the party asserting abandonment to "strictly prove" its claim. *Electro Source*, 458 F.3d at 935 n.2 (citations omitted). The Ninth Circuit has not yet articulated whether this high standard requires "clear and convincing" evidence or a preponderance of the evidence. *FreecycleSunnyvale v. Freecycle Network*, 626 F.3d 509, 514–15 (9th Cir. 2010). However, the Court need not determine which evidentiary standard is applicable because the Bradys have failed to carry their burden under either

1    standard.[5]

2         First, the Bradys' argue that Utopia's statement to the SEC, that Utopia "does not

3    intend to continue to operate the business of Ipanema," but does "intend[] to utilize the

4    Ipanema brand for a different line of shoe products," constitute abandonment. (ECF

5    No. 95-14, Ex. 13, at 599.) The Court does not find that Utopia's statements constituted

6    abandonment. As discussed above, the phrase "does not intend to continue," if

7    anything, is a prospective intent to abandon because it connotes that Utopia was, at the

8    time of the statement, operating Ipanema's business. Even if the first phrase, in

9    isolation, could be construed as an intent not to resume use, Utopia's follow up

10   statement, that it "intends to utilize the Ipanema brand for a different line of shoe

11   products," makes clear that Utopia did intend to keep using the mark, albeit on

12   different footwear. This is further supported by Utopia's November 11, 2000, Form10-

13   QSB filing with the SEC, which stated that during the nine months prior to September

14   30, 2000, Utopia generated $6,644,000 selling products under the NAKEDFEET and

15   IPANEMA marks. (ECF No. 108-10, at 131–32.)

16        Second, the Bradys argue that Grendene "did nothing at all with the 'Ipanema'

17   trademark in the U.S. [from approximately 2007 to 2011]." (ECF No. 266, at 5.)

18   However, this is not the case as Grendene licensed the '543 mark back to CSC in 2007,

19   and CSC sold IPANEMA footwear under the mark through 2009. (ECF No. 108-15,

20   Ex. M; ECF No. 216-24, Ex. M.) Grendene then started to sell footwear under the

21   IPANEMA mark in the U.S. beginning in 2010. (ECF No. 95-16, at 724.) Thus there

22   is no prima facie evidence of abandonment by Grendene because there is no three year

23   period of nonuse. *See* 15 U.S.C. § 1127; *see also FreecycleSunnyvale*, 626 F.3d at 514

24

25

26

27   _____

28        [5] The Court notes that while Grendene argues that "clear and convincing" evidence is the standard, (ECF No. 216-1, at 12), the Bradys do not argue for a specific standard. (*See* ECF No. 266.)

1    (only a "naked license" results in abandonment).[6]

2        **3. Assignment**

3        For a trademark assignment to be valid, the Lanham Act requires that the mark

4    be assigned "with the good will of the business in which the mark is used, or with that

5    part of the good will of the business connected with the use of and symbolized by the

6    mark." 15 U.S.C. § 1060(a)(1); *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d

7    1280, 1289 (9th Cir. 1992). An assignment without the goodwill is referred to as an

8    "assignment in gross." *E. & J. Gallo Winery*, 967 F.2d at 1289. To determine whether

9    the goodwill was assigned with the mark, the Court makes a case-by-case

10   determination whether the products or services offered by the assignee under the mark

11   are "substantially similar" to those that were offered by the assignor under the mark.

12   *Sugar Busters LLC v. Brennan*, 177 F.3d 258, 266 (5th Cir. 1999) (citations omitted);

13   *see also PepsiCo*, 416 F.2d at 288; *Glow Industries, Inc. v. Lopez*, 273 F. Supp. 2d

14   1095, 1108 (C.D. Cal. 2003) (citations omitted). However, even if a mark's goodwill

15   is not transferred contemporaneously with the assignment of the mark's rights, that

16   does not necessarily invalidate the assignment. *See* RESTATEMENT (THIRD) OF UNFAIR

17   COMPETITION § 34 cmt. f (1995). Because a mark retains its meaning even after an

18   assignment in gross, an eventual assignment of the mark and the goodwill to the same

19   assignee, while the mark retains its meaning, will "patch up the transaction." 3 J.

20   THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION §

21   18:17 (4th ed. 1996). This makes sense because there are essentially two pieces to a

22   valid trademark in the context of an assignment: the trademark rights and the

23   trademark's goodwill. Though assigning the rights without the goodwill constitutes an

24   invalid assignment, a subsequent assignment of the mark's goodwill to the same entity

25

26        [6] As the Bradys do not argue or provide evidence that Grendene's license back
     to CSC was a naked license, (*see* ECF No. 266), and " the proponent of a naked license
27   theory of trademark abandonment must meet a 'stringent standard of proof,'" the Court
     does not find that the license back was a naked license. *FreecycleSunnyvale*, 626 F.3d
28   at 514 (quoting *Barcamerica Intern. USA Trust v. Tyfield Importers, Inc.*, 289 F.3d
     589, 596 (9th Cir. 2002)).

while the mark retains meaning would create a valid assignment even though the initial assignment was not valid. *See id.* While the November 12 Order found disputes of material fact on this issue based on certain statements and a lack of evidence, (*see* ECF No. 158, at 12–13), the parties now present additional evidence.

The Court notes that the caselaw surrounding whether an assignment is an invalid assignment in gross is not a model of consistency. Some decisions have found differences between products in certain categories are substantial enough to invalidate an assignment, including: (1) musical groups, *Marshak v. Green*, 746 F.2d 927 (2d Cir. 1984); (2) syrups, *PepsiCo*, 416 F.2d 285; (3) alcoholic beverages, *Atlas Beverage Co. v. Minneapolis Brewing Co.*, 113 F.2d 672 (8th Cir. 1940); (4) baking powders, *Indep. Baking Powder Co. v. Boorman*, 175 F. 448 (C.C.D.N.J. 1910); (5) soft drinks, *W. T. Wagner's Sons Co. v. Orange Snap Co.*, 18 F.2d 554 (5th Cir. 1927); and (6) shoes, *Clark & Freeman Corp. v. Heartland Co. Ltd.*, 811 F. Supp. 137 (S.D.N.Y. 1993). Other decisions have found that differences between products in other categories are not substantial enough to invalidate an assignment, including: (1) drinking and dining establishments, *Brewski Beer Co. v. Brewski Brothers Inc.*, 47 U.S.P.Q.2d 1281 (T.T.A.B. 1998); (2) check guarantee cards, *Visa, U.S.A., Inc., v. Birmingham Trust Nat'l Bank*, 696 F.2d 1371 (Fed. Cir. 1982); (3) chicken breeds, *Hy-Cross Hatchery, Inc. v. Osborne*, 303 F.2d 947 (C.C.P.A. 1962); and (4) tobacco formulas, *Beech-Nut Packing Co. v. P. Lorillard Co.*, 299 F. 834 (D.N.J. 1924).

While the Bradys argue that the latter cases found that "the specific services or goods were essentially identical," (ECF No. 266, at 15–16), the Court is not so convinced. For example, the *Hy-Cross* court specifically noted that, even though the assignor only sold a single breed of chicken, the assignment was valid no matter what chicken breed the assignee sold. 303 F.2d at 950. While there exist many different types of shoes, the product category at issue in this lawsuit, the same is true of chicken

breeds.[7] As the caselaw in this area provides conflicting guidance, the Court turns to the basic tenets of trademark law.

"The ultimate concern in all cases is the welfare of the public." *PepsiCo*, 416 F.2d at 289. Indeed, the "central purpose" of the various invalidity provisions "is protection against consumer confusion." *Syntex Labs., Inc. v. Norwich Pharmacal Co.*, 315 F. Supp. 45, 54 (S.D.N.Y. 1970) (citing *PepsiCo*, 416 F.2d at 288). Based on the fundamental purposes of trademark law, the analysis in *Clark & Freeman* is instructive. In that case, the assignor had built a reputation selling fashionable women's shoes under the mark. *Clark & Freeman*, 811 F. Supp. at 141 ("Sears sold only women's pixie boots under the mark . . . ."). The assignee then applied the mark only to men's shoes. *Id.* ("[P]laintiffs immediately applied it only to men's shoes, then later to men's hiking boots.") Based on the differences between the products, the *Clark & Freeman* court found that the "markets for the two goods are substantially distinct" because "it is unlikely that men buying plaintiffs' 'Heartland' shoes would be considering a reputation for footwear generally that Sears built by selling women's boots." *Id.*

The Bradys argue that the shoes sold by CSC under the IPANEMA mark, "high fashion women's shoes," differ significantly from those sold by Grendene under the IPANEMA mark, "plastic beach sandals." (ECF No. 266, at 5–6.) The Court disagrees. The products marketed by ISC under the IPANEMA mark were fashionable women's footwear that retailed for approximately $25 to $50. (ECF No. 216-5, Ex. A, 22:2–23:24, 135:9–14.) The products marketed by Utopia under the IPANEMA mark were fashionable women's shoes, boots, and sandals that retailed for approximately $18.50 to $50. (ECF No. 216-7, Ex. C, 22:8–23:5.) The products marketed by CSC under the IPANEMA mark were fashionable women's footwear that retailed for

---

[7] According to data collected by the United Nations' Domestic Animal Diversity Information System, there are 53 breeds of chicken in the United States and 2,633 breeds of chicken across the globe. *Number of Breeds by Species and Country*, UNITED NATIONS FOOD AND AGRICULTURE ORGANIZATION, http://dad.fao.org/cgi-bin/EfabisWeb.cgi?sid=1b9408faaf38cf3a67973ce670aa7736, reportsreport10 (last visited May 15, 2015).

approximately $40 to $50. (ECF No. 216-21, Ex. J.) The products marketed by Grendene under the IPANEMA mark are plastic men's, women's, and children's sandals that retail for approximately $18 to $55. (ECF No. 216-29, Ex. Q); *Ipanema*, GRENDENE USA, INC., http://www.ipanemausa.com/ (last visited May 15, 2015).

Based on the undisputed evidence presented, the Court finds that the products sold by ISC, Utopia, CSC, and Grendene are "substantially similar." *Sugar Busters*, 177 F.3d at 266. The products sold by all the companies involved fashionable women's footwear at a low to medium price point. Though Grendene has expanded into men's and children's footwear, it too sells women's footwear. This stands in contrast to *Clark & Freeman* where the assignor sold only fashionable women's footwear and the assignee sold only functional men's footwear, though both sold boots. 811 F. Supp. at 141. While the Bradys make much of the different materials used by Grendene, plastic in contrast to its predecessors' use of leather, wood, and cork, and the different type of women's shoes sold by Grendene, "flip-flops" rather than "high fashion dress sandals," (ECF No. 266, at 1, 6, 13), consumers purchasing Grendene's shoes under the IPANEMA mark would still likely consider the reputation built by Grendene's predecessors because they too sold fashionable women's shoes at a similar price point. *Cf. Clark & Freeman*, 811 F. Supp. at 141. Moreover, the statements of Grendene's attorneys made before the United States Patent and Trademark Office and cited by the Bradys, (ECF No. 260-1, at 2 (quoting (ECF No. 95-6, Ex. 5, at 496))), are irrelevant for two reasons: (1) the Trademark Trial and Appeal Board rejected this argument, (ECF No. 95-7, at 503 ("[Grendene's] sandals, because they are encompassed within the identification 'footwear,' must be considered legally identical to this cited registrant's goods . . . .")); and (2) likelihood of confusion analysis differs from assignment in gross analysis, *compare Sugar Busters*, 177 F.3d at 266 (requiring substantial similarity for a valid assignment) *with* (ECF No. 95-7, at 502 ("It is well settled that goods need not be similar . . . to support a finding of likelihood of confusion.")). Accordingly, the Court finds that Grendene has obtained a valid

- 15 -

assignment of the '543 mark. As the parties do not dispute that the successor to ISC's Settlement Agreement rights is the person or entity who has been validly assigned the '543 mark that ISC obtained as a condition precedent to the Settlement Agreement, (*see* ECF No. 93, at 14–15), the Court finds that Grendene is a successor to ISC under that agreement. As all five of the Bradys' causes of action against Grendene in this case are based on Grendene's use of the IPANEMA mark on Grendene's sandals, (*see* ECF No. 4), the Court finds that all those causes of action are barred by the Settlement Agreement. Accordingly, the Court GRANTS Grendene summary judgment on all five of the Bradys' causes of action.[8]

**E. Grendene's Counterclaims**

Because the Court has granted Grendene summary judgment on all of the Bradys' causes of action, the Court finds good cause to *sua sponte* consider whether Grendene's counterclaims, (ECF No. 56, at 12–13), should be dismissed for either lack of standing or mootness. *See CIBER, Inc. v. CIBER Consulting, Inc.*, 326 F. Supp. 2d 886 (N.D. Ill. 2004) (dismissing the defendant's counterclaims after the plaintiff's trademark infringement causes of action were dismissed with prejudice); *but see Secular Orgs. for Sobriety, Inc. v. Ullrich*, 213 F.3d 1125, 1129, 1131–32 (9th Cir. 2000) (finding a trademark cancellation counterclaim not moot even after judgment was entered in favor of the defendant on all of the plaintiff's causes of action).

**V. CONCLUSION AND ORDER**

Based on the reasons stated above, **IT IS HEREBY ORDERED** that:

1.    Grendene's motion for summary judgment, (ECF No. 216), is **GRANTED** as to all five of the Bradys' causes of action; and

2.    Given the Court's grant of summary judgment in favor of Grendene, the Court finds good cause to *sua sponte* consider whether Grendene's counterclaims should be dismissed. The Court sets this issue for

---

[8] As the Court is granting Grendene summary judgment based on the Settlement Agreement, the Court does not reach Grendene's laches or interlocutory appeal arguments. (*See* ECF No. 216-1, at 18–25.)

1  consideration at a hearing on **July 31, 2015, at 1:30 p.m.** The parties shall

2  each file an opening brief on or before **June 19, 2015**, and may each file

3  a responsive brief on or before **July 3, 2015**.

4  DATED:  June 3, 2015

5

6  HON. GONZALO P. CURIEL

7  United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28